IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JEFFREY B. BIGGERS, M.D. | § | |
| | § | |
| V. | § | C.A. No. _____ |
| | § | |
| NORTHWESTERN MUTUAL LIFE | § | |
| INSURANCE COMPANY | § | |

## PLAINTIFF'S COMPLAINT

This is a suit for damages and other relief by Plaintiff Jeffrey B. Biggers, M.D., against Northwestern Mutual Life Insurance Company. It is an action for breach of a disability insurance policy, violations of the Texas Deceptive Trade Practices Act, violations of the Texas Insurance Code, and damages.

### Parties

1.   Plaintiff Jeffrey B. Biggers, M.D. is a resident citizen of Mesquite, Dallas County, Texas.

2.   Defendant Northwestern Mutual Life Insurance Company ("NW Mutual") is a domestic or foreign corporation licensed to do business and doing business in the State of Texas. It can be served with service of process via its registered agent, C. Tait Cruise, 5420 Lyndon B. Johnson Freeway, Suite 1300, Two Lincoln Center, Dallas, TX 75240, or wherever it may be found.

### Jurisdiction and Venue

3.   This Court has jurisdiction over this civil action pursuant to 28 U.S.C. §1332(a)(1) since it is an action between citizens of two different states and the matter in controversy exceeds the sum of $75,000.

## Facts

4.  NW Mutual is in the insurance business and sells various forms of life insurance, disability insurance, and health insurance. The promise of disability insurance is to provided income protection if an insured is disabled by injury or sickness.

5.  Implicit in the promise of the NW Mutual policy is that it will timely, fairly, and objectively adjust and pay a covered claim. If in doubt about the cause or nature of the insured's disability, NW Mutual implicitly promises to fairly and objectively investigate the claim and promptly pay if the claim meets the policy requirements.

6.  Dr. Biggers has spent decades as a physician as of the highest quality. His talent was evident when he graduated from University of Texas Southwestern Medical Center in 1981, and he refined it over time. A residency in general surgery was followed by a colon and rectal surgery fellowship. He opened his own office in 1987.

7.  In 1995, Dr. Biggers applied for The Northwestern Mutual Life Insurance Company's Disability Income Policy ("Policy"). The Policy was issued on November 9, 1995, and the policy number was D1144922. The Policy promised to pay a disability benefit if the insured became disabled from working his regular occupation while the Policy was in effect.

8.  Dr. Biggers also applied for two Disability Overhead Expense Policies ("Office Overhead Policies"), which NW Mutual issued by September 2000. The policy numbers were D1151802 and D1391442. Together, the Office Overhead Policies promised to pay for office expenses up to $8,500 per month if the insured became disabled while they were in effect.

9.      The Policy defines Total Disability as a time when the insured is "unable to perform the principal duties of the regular occupation". The Policy defines Regular Occupation as "the occupation of the Insured at the time the Insured becomes disabled". If the insured is exclusively engaged in a medical specialty for which board certification is available, that specialty is the "regular occupation".

10.     During all relevant times, Dr. Biggers' regular occupation was and is a general surgeon. He is certified as a general surgeon by the American Board of Surgery.

11.     In 2008, Dr. Biggers was diagnosed with Barrett's Esophagus[1], a condition in which tissue in the esophagus is replaced by tissue similar to the intestinal lining. Barrett's Esophagus is often diagnosed in people with long-term gastroesophageal reflux disease. It is also associated with an increased risk of esophageal cancer. This diagnosis would prove prescient for Dr. Biggers.

12.     In January 2012, he was diagnosed with esophageal cancer and was forced to undergo an esophagectomy[2], an aggressive treatment for attempted cure of esophageal cancer. After undergoing the surgery, patients use a feeding tube for several weeks. Once they resume a normal diet, the stomach's reduced size can lead to weight loss and the need to eat more frequent, smaller meals. Dr. Biggers suffered from these side effects, plus post-operative pain, fatigue, and insomnia. These side effects are often permanent and disabling.

---

[1] https://www.mayoclinic.org/diseases-conditions/barretts-esophagus/symptoms-causes/syc-20352841

[2] This surgery removes part of the esophagus and reconstructs it with another organ, usually the stomach. https://www.mayoclinic.org/tests-procedures/esophagectomy/about/pac-20385084

3

13.    Because of his surgery and treatment, Dr. Biggers was forced to stop working. He applied for disability benefits under both the Policy and the Office Overhead Policies. NW Mutual approved benefits from April 2012 to September 2012. It assigned Shaniah Euell, a "disability benefits team consultant", to the claim.

14.    On September 5, 2012, NW Mutual terminated Dr. Biggers's claims because it concluded that "you are pretty much working at the level you was [sic] working prior to your disability".

15.    During this time, Dr. Biggers returned to work as quickly as possible but struggled mentally and physically to perform as a general surgeon while dealing with his diagnosis and the disabling side effects of esophagogastrectomy. His full mental focus was required to maintain his practice, and his patients relied on his full attention to protect them. Dr. Biggers, in turn, relied on NW Mutual to protect him and look out for his best interests. NW Mutual failed him in several ways.

16.    First, NW Mutual miscalculated Dr. Biggers' pre-disability income. It never asked for information that would reveal his average monthly income for any 2 of the 5 calendar years before his disability started in 2012[3].

17.    On June 20, 2019, Dr. Biggers provided surgical logs for 2007-2008 and his 2007 tax return, which showed his actual income during this time period. The information was supplied so that NW Mutual could accurately calculate his disability income. NW Mutua's failure to request relevant earned income

---

[3] Oddly, Northwestern Mutual never even asked for Dr. Biggers' 2011 income tax return.

information in 2012 led it to underpay his disability claim. Given how easily accessible this information was, it does not appear to have been an accident.

18. Second, NW Mutual never told Dr. Biggers that he qualified for the Transition Benefit. The Policy promises to pay a benefit for up to 12 months after the insured recovers from a disability if he has returned to continuous full-time employment. Although MW Mutual determined that he met these requirements in 2012, it kept conspicuously silent about his eligibility for this benefit. It never paid this benefit. It never even mentioned the benefit.

19. The Policy also has a waiver of premium benefit provision. Because Dr. Biggers has been continuously disabled since 2012, he should not have had to pay any premiums from 2012 to 2017. From 2012 through 2017, he paid NW Mutual $180,828.64 in premiums. Those funds do not rightfully belong to NW Mutual.

20. In addition, the Policy provides annual dividends to its insureds. These dividends are often credited against the annual premium. However, when the insured's premiums have been waived due to disability, the dividend goes entirely to the insured. Due to its failure to waive Dr. Biggers's premiums, NW Mutual also underpaid dividends to him from 2012 to 2017.

21. Third, NW Mutual prematurely terminated his claim in 2012. A review of his production and income taxes in the months and years after 2012 demonstrates that Dr. Biggers continued to qualify for disability benefits, as his income remained less than 80%. Dr. Biggers underwent a disabling operation for a life-threatening condition. Although he returned to work as quickly as possible, he struggled mentally and physically to perform as a general surgeon while dealing with the

inability to eat or sleep normally. Dr. Biggers was forced to substantially alter his surgical practice, which came with a wave of increased stress. This, in turn, caused harm to his personal and professional life.

22.     NW Mutual's decision to terminate the claim came in a particularly cruel and deceptive manner. It terminated his disability claim in 2012 because Shaniah Euell concluded that he was "pretty much working at the level you [sic] was working prior to your disability". This was false. Dr. Biggers never told Ms. Euell that he was back to his previous level of work activity, nor did he ask to close his disability claim. Dr. Biggers was not given NW Mutual's calculations of his pre-disability income, only its end number. It was thus impossible for him to know if NW Mutual's denial was right or wrong.

23.     Starting in May 2019, Dr. Biggers tried to get more information from NW Mutual about why it terminated his disability and office overhead claims in 2012, and how it calculated his benefits in 2012. He provided numerous documents and other evidence supporting his position.

24.     For instance, Dr. Biggers's income was mostly at or below the 80% threshold from 2012 through the present. His June 2012 income was barely above the 80% level, and July was an aberrant month of collections which can easily occur in a medical practice that relies on delayed insurance payments. The Policy does not state that 2 months of ineligibility automatically terminates the claim. The rest of 2012 was well below the threshold for allowing benefits but was ignored because the claim was terminated prematurely. Although NW Mutual later approved the claim for

July-August 2012 and September-November 2012, it denied all other benefits from 2012 to 2018.

25. If NW Mutual had not wrongly terminated Dr. Biggers's claim, he would have had the option to modify his workload to a tolerable level consistent with his permanent disability. There were times when he was ill and would have welcomed the opportunity to slow down or recover before continuing to push himself on a daily basis. Despite his motivation to do as much as he could, he never returned to pre-disability work activity. This is also evidenced by his renewed disability claim, which NW Mutual has approved since September 2018.

26. Finally, NW Mutual underpaid Dr Biggers's claim from September 2018 to the present because it wrongly classified his occupation. In 2018, Dr. Biggers was, as always, a surgeon. He took a two day course in 2009 to learn how to perform Botox and filler injections, a process he learned as a hobby so that he could save money for his wife, close family, and friends. He only performed these injections in his free time and almost never at his office. He was not regularly engaged in more than one occupation. Instead, NW Mutual lumped Botox and filler injections into Dr. Biggers's job description as a way to underpay his claim.

27. By July 23, 2019, Dr. Biggers had provided all of the information necessary for NW Mutual to re-process his 2012 disability claim.

28. On December 6, 2019, Dr. Biggers sent a demand letter to NW Mutual.

29. On January 10, 2020, NW Mutual stated that it had received Dr. Biggers's "appeal".

30. On February 27, 2020, NW Mutual again denied Dr. Biggers's 2012 disability claim and office overhead claims.

31.  Having exhausted all administrative remedies, Dr. Biggers brings this action to recover the disability insurance benefits promised in the policy.

## Breach of the Insurance Contract

32.  Plaintiff incorporates the preceding factual allegations.

33.  At all material times, the policy was in full force and effect. All of the premium payments were timely paid by Plaintiff. Plaintiff provided NW Mutual with the information and evidence needed to properly pay his 2012 disability claim and office overhead claims. However, NW Mutual breached its duty under the insurance policy by failing and refusing to properly pay the 2012 disability claim and office overhead claims. The damages include the unpaid monthly disability benefit of $2,530.80 for August-September 2012, as well as additional benefits of $83,516.40 from November 2012-September 2018.

34.  The Policy also has a waiver of premium benefit provision. Because Dr. Biggers has been continuously disabled since 2012, he should not have had to pay any premiums from 2012 to 2017. His damages also include the $180,828.64 in premiums that he paid NW Mutual from 2012 to 2017.

35.  In addition, the Policy provides annual dividends to its insureds. These dividends are credited against the annual premium. However, when the insured's premiums have been waived due to disability, the dividend goes entirely to the insured. Due to its failure to waive Dr. Biggers's premiums, it also underpaid dividends to him from 2012 to 2017.

36.     NW Mutual has harmed Dr. Biggers by refusing to pay the monthly benefits for the above listed time periods, refunding his premiums from 2012-2017, and underpaying dividends from 2012-2017, all for which Dr. Biggers now sues.

**Breach of Duty of Good Faith and Fair Dealing**

37.     Plaintiff incorporates the preceding factual allegations.

38.     Insurers have an affirmative common law duty of good faith and fair dealing. That means that in the handling and adjustment of a claim, the insurer is obligated to act in good faith and deal fairly with the policyholder in delivering on the promise of the policy. NW Mutual was obligated to meet this common law obligation once a claim on the policy was made.

39.     The guiding principles of proper claims handling help ensure the insurer meets this obligation. Claims handling personnel must be adequately trained on these principles. These principles include an obligation to promptly acknowledge the claim, timely investigate the claim, and adjust that claim in a fair, objective, and non-biased manner.

40.     Timely adjustment and investigation means seeking information and evidence to answer questions raised that may clarify the insurer's obligation to pay or deny the claim. Traditional claims handling principles also include a responsibility to find coverage, err in favor of the insured, resolve ambiguities and doubt in favor of the insured, and pay the claim if it meets the policy requirements for payment.

41.     An objective and thorough investigation includes inquiry into reasons to pay a claim, along with any reasons to deny the claim. The insurer must look at the positive and negative before making its claim decision. Claims decisions must be

based on facts, not guesses or speculation. Artificial obstacles to payment, unreasonable interpretation of policy terms, speculation, outcome-oriented investigations, and bias should pay no role in delivery on its promise. In following these principles, the insurer is positioned to deliver on the promise of the policy. It is also positioned to meet its obligation of good faith and fair dealing.

42.     NW Mutual and its claims personnel failed to follow these claims handling principles. Its adjusters, on information and belief, lacked the requisite training to properly investigate and adjust this claim. They further failed to adjust this claim in a fair and equitable manner. They ignored their responsibility to find coverage or err or resolve doubts in favor of the insured and resolve ambiguities in favor of the insured. They failed to objectively and fairly investigate and evaluate this claim. They merely looked for a reason to deny, ignoring reasons to pay the claim. NW Mutual was fully aware of and endorsed this conduct. In addition, NW Mutual and its adjusters failed to acknowledge Dr. Biggers's mental and physical condition and instead denied this claim solely based on guesswork and speculation.

43.     Throughout this claim, NW Mutual utterly failed to acknowledge in its communications with Plaintiff that it had the affirmative duty to look for coverage, assist him with his disability claim, and get the proper documents to determine if his 2012 disability claim and office overhead claims should have been approved or continued. Instead, NW Mutual presumably began and ended its investigation and adjustment of this claim with the lackadaisical approach evinced by adjusters like Shania Euell. In doing so, it sought to find support for its conclusion that Dr. Biggers's disability claim and office overhead claims should be terminated. This

10

was the sole focus of any investigation NW Mutual undertook. It was an outcome-oriented focus seeking to find a reason for denial.

44.    Throughout the claim, NW Mutual's hostile approach was clear. One example was its outright refusal to provide any of the medical records in this claim. NW Mutual adjuster Shania Euell wrote in a May 13, 2019 letter that she would not provide any of Dr. Biggers's medical records because they were "the property of Northwestern Mutual".

45.    When confronted on this misrepresentation, NW Mutual next argued that Dr. Biggers's medical records were actually owned by his medical providers, and that he had to ask their permission to get his own medical records. This hostile approach made it impossible for Dr. Biggers to know what evidence NW Mutual had in its possession that supported his disability and office overhead claims. It also made it impossible for him to determine if NW Mutual even had all of the medical records relevant to his claims.

46.    Another example of NW Mutual's hostility was its refusal to disclose the names of its medical record reviewers that it used in Dr. Biggers's claim. NW Mutual asked Dr. Biggers to cite any legal authority that required it to do so. Dr. Biggers cited to Tex. Ins. Code. §541.060(a), Tex. Ins. Code. §541.060(a)(7), and related portions of those statutes. However, NW Mutual continued to refuse to provide Dr. Biggers his own medical records and identities of its medical record reviewers in this claim.

47.    A fourth example of NW Mutual's hostility came from its creation of artificial deadlines designed to make Dr. Biggers panic and miss critical evidence that would support his claims. In its June 20, 2019 letter, NW Mutual stated that asks all of

its insureds to appeal any claim denial within 30 days of the decision. Neither the Policy nor the Office Overhead Policies contained this time limit. The June 20, 2019 letter from NW Mutual is written evidence that it created an artificial timeline for Dr. Biggers to submit an appeal. It is also written evidence that NW Mutual uses this approach is many other claims like this.

48.    Proper claims handling conduct requires the insurer, among other things, to work with the insured to find coverage. In this case, NW Mutual worked only to find reasons to deny claims and underpay claims. Coverage could have easily been found if NW Mutual fully and fairly reviewed the evidence submitted by Dr. Biggers on June 20, 2019. Doing so would have led to only one conclusion: that his 2012 disability claim and office overhead claims were covered. NW Mutual's liability as of the time of its denial was thus reasonably clear.

49.    This conduct constitutes a breach of its common law duty of good faith and fair dealing. NW Mutual had a duty to fairly, objectively, and thoroughly investigate, evaluate, and adjust Plaintiff's claim. In this instance, its denial was made without any reasonable basis. At all material times, NW Mutual's liability was reasonably clear.

50.    If NW Mutual had not wrongly terminated Dr. Biggers's claim in 2012, he would have had the option to modify his workload to a tolerable level. There were times when he was ill and would have welcomed the opportunity to slow down or recover before continuing to push himself on a daily basis. Despite his motivation to do as much as he could, he never returned to pre-disability work activity. He was forced to file another disability claim, which NW Mutual has approved since September

2018. In reality, Dr. Biggers has been disabled since 2012, and her remains disabled now.

51.    Dr. Biggers relied on NW Mutual to honestly, objectively and fairly investigate and adjust his claims in good faith. That reliance has been to his detriment. NW Mutual's breach of its common law duty of good faith and fair dealing instead caused Dr. Biggers to suffer considerable emotional distress and mental anguish. This conduct further caused injury and damage, for which Dr. Biggers further sues.

## Violations of the Texas Insurance Code

52.    Plaintiff incorporates the preceding factual allegations.

53.    The Texas Insurance Code prohibits, among other things, certain activity by an insurer in the handling and adjustment of claims for policy benefits. Its focus is on the insurers claims handling conduct. NW Mutual, in its handling and adjustment of Plaintiff's claim, has engaged in just such prohibited unfair insurance claims practices in violation of Chapters 541 and 542 of the Texas Insurance Code. These unfair practices have also been committed knowingly. NW Mutual has committed, *inter alia*, the following unfair claims settlement practices:

    i.    Misrepresenting to Dr. Biggers material facts or policy provisions relating to the coverage at issue;

    ii.    Failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of the Biggers claim when its liability was reasonably clear;

    iii.    Failing to promptly provide to Dr. Biggers a reasonable explanation of the basis in the policy, in relation to the facts or applicable law, for its denial of a claim or offer of a compromise settlement of a claim;

    iv.    Failing within a reasonable time to affirm or deny coverage of a claim to Dr. Biggers;

13

    v.   Refusing to pay a claim without conducting a reasonable investigation of the claim;

    vi.   Knowingly misrepresenting to Dr. Biggers pertinent facts or policy provisions relating to coverage at issue;

    vii.   Failing to acknowledge with reasonable promptness pertinent communications relating to the claim arising under the policy;

    viii.   Making a statement in a manner that would mislead a reasonably prudent person to a false conclusion of a material fact, and failing to state those material facts necessary to make other statements made not misleading, considering the circumstances under which the statements were made;

    ix.   Not attempting in good faith to effect a prompt, fair, and equitable settlement of a claim in which liability has become reasonably clear; and

    x.   Engaging in this conduct knowingly with actual knowledge of the falsity, unfairness, or deception of these foregoing acts and practices.

54.   These provisions of the Insurance Code are intended to protect insurance consumers from misleading or false statements about the policy or claim or compel the insurer to disclose material facts to avoid misleading the consumer. They are also intended to compel the insurer to promptly resolve claims when liability is reasonably clear. NW Mutual violated these provisions of the Insurance Code.

55.   NW Mutual claimed in its May 13, 2019 letter that it would not provide any of Dr. Biggers's medical records to him because they were "the property of Northwestern Mutual". On June 20, 2019, NW Mutual next argued that Dr. Biggers's medical records were actually owned by his medical providers, and that he had to ask their permission to get his own medical records.

56.   This hostile approach made it impossible for Dr. Biggers to know what evidence NW Mutual had in its possession that supported his disability and office overhead

14

claims. It also made it impossible for him to determine if NW Mutual had all of the medical records relevant to his claims.

57.     These statements were misleading and were material, and they made it impossible for Dr. Biggers to determine if NW Mutual had all of the evidence that supported his claims. These statements were intended to mislead and did mislead Dr. Biggers to a false conclusion about the material facts related to the coverage at issue.

58.     Another misleading statement by NW Mutual was its refusal to disclose the names of its medical record reviewers that it used in Dr. Biggers's claim. NW Mutual asked Dr. Biggers to cite any legal authority that required it to do so. Dr. Biggers cited to Tex. Ins. Code. §541.060(a), Tex. Ins. Code. §541.060(a)(7), and related portions of those statutes. However, NW Mutual still refused to provide identities of its medical record reviewers in this claim. These statements were intended to mislead and did mislead Dr. Biggers to a false conclusion about a policy provision related to the coverage at issue.

59.     A third misleading statement by NW Mutual came from its creation of artificial deadlines designed to make Dr. Biggers panic and miss critical evidence that would support his claims. In its June 20, 2019 letter, NW Mutual stated that asks its insureds to appeal any claim denial within 30 days of the decision. Neither the Policy nor the Office Overhead Policies contained this time limit. The June 20, 2019 letter from NW Mutual is written evidence that it created an artificial timeline for Dr. Biggers to submit an appeal. These statements were intended to mislead and did mislead Dr. Biggers to a false conclusion about a policy provision related to the coverage at issue.

15

60.   Any claim by NW Mutual that it received no information to support the claim would be untrue. Dr. Biggers provided NW Mutual all of the information available. Even if NW Mutual believed it had no information to support the claim, as a part of its duty to investigate and perform a reasonable investigation, it was obligated to inform its policyholder what specific information it needed to perfect their claim. It failed to do so. Any investigation NW Mutual undertook cannot be reasonable or thorough without at least, under these circumstances, asking Dr. Biggers for any information he might have to support their claim. Dr. Biggers even invited this inquiry on June 20, 2019, asking NW Mutual to advise in writing what additional documents were needed to re-process his claims.

61.   At no time before this suit was filed did NW Mutual make any attempt, in good faith or otherwise, to settle Dr. Biggers's claim. Though it received the December 6, 2019 settlement demand, which clearly and unequivocally stated the facts in support of coverage of the claim, NW Mutual chose to ignore the facts. It chose to ignore the evidence. It chose to ignore the equitable bases for coverage. Its liability was reasonably clear. Failing to make an effort to promptly, fairly, and equitably settle this claim was a further violation of the Insurance Code provisions.

62.   At all material times, NW Mutual's conduct in this regard was intentional. It knowingly engaged in this conduct. It knew it had no factual basis upon which to deny Dr. Biggers's claims. Instead, it intentionally chose to ignore the factual and legal evidence provided by Dr. Biggers. It chose to parrot its flawed reasoning, perform no investigation, not offer a single penny, and hope that Dr. Biggers would simply go away.

16

63.   All of this conduct, along with NW Mutual's other acts and omissions, violated Texas Insurance Code §§541.001, et seq., 542.001, et seq., including the Insurance Code's provision for the prompt payment of claims, §542.051, et seq.

### Northwestern Mutual's Deceptive Trade Practices

64.   Plaintiff incorporates the preceding factual allegations.

65.   NW Mutual has also violated the Texas Deceptive Trade Practices - Consumer Protection Act, §§17.46, et. seq. by its misrepresentations and by engaging in, *inter alia*, false, misleading, or deceptive practices, unconscionable conduct, and engaging in acts or practices in violation of the Tex. Ins. Code Ann. §541.001 et seq. Three examples are NW Mutual's misrepresentations regarding Dr. Biggers's medical records, refusing to disclose the identities of the medical record reviewers who reviewed his claim, and misrepresenting the appeal deadline. It was also unconscionable for NW Mutual to blindly rely on medical record reviewers lacking the appropriate education, training, or experience in areas of medicine relevant to the claim.

66.   NW Mutual's conduct as demonstrated in this action is not isolated to this claim. On information and belief, this conduct is part of a common pattern and common practice toward other policyholders like Dr. Biggers with individual disability policies who submit disability claims. These misrepresentations and mischaracterizations of an insured's regular occupation is unconscionable, particularly since NW Mutual's victims are disabled people already struggling with physical and emotional disabilities.

67.     Dr. Biggers bought the NW Mutual policy to give him peace of mind if he became disabled and unable to work. NW Mutual took away that peace of mind. Dr. Biggers relied on NW Mutual to honestly, objectively, and fairly investigate and adjust their claim in good faith. That reliance has been to his detriment. NW Mutual's misrepresentations and unconscionable conduct instead caused Dr. Biggers to suffer considerable emotional distress and mental anguish. This conduct further caused injury and damage to Plaintiff, for which he further sues.

### Knowing Conduct

68.     The conduct complained of in this action was engaged in knowingly, as that term is defined in Ch. 17 of the Texas Business and Commerce Code and Tex. Ins. Code §541.001(1). NW Mutual knew what it was doing. It knew its claims handling conduct violated provisions of the Texas Insurance Code. It knew of its false, misleading, and deceptive nature conduct in handling this claim.

### Damages

69.     The acts, omission, and practices of NW Mutual constituting a tort were the proximate cause of the damages sustained by Plaintiff. All of NW Mutual's acts and practices in violation of the various statutes herein recited were the producing cause of the actual damages suffered by Plaintiff, including, but not limited to, damages for mental anguish and emotional distress, as well as actual damages under the insurance contract. For all of these wrongful acts, omissions, and practices, Plaintiff is entitled to money damages as may be found by the jury.

70.     The acts, omissions, and practices of NW Mutual constituting a tort herein warrant the imposition of 18% per annum pursuant to Tex. Ins. Code §542.060, *et seq.*

71.    NW Mutual's actions in handling of Plaintiff's claim were done knowingly and intentionally, or with a conscious or callous disregard for Dr. Biggers's rights and welfare. As such, its actions reflected gross negligence and were so outrageous as to warrant the imposition of punitive or exemplary damages, for which Plaintiff further sues for recovery. Plaintiff seeks such punitive or exemplary damages as may be assessed by the jury in its discretion.

72.    Plaintiff also requests, in addition to the amount of benefits withheld, prejudgment interest on any such award. He is entitled to prejudgment interest as additional compensation, and pursuant to Tex. Ins. Code §1103.104, or on principles of equity.

## Request for Attorneys' Fees

73.    This suit was made necessary by the wrongful acts and practices of NW Mutual. Plaintiff has been forced to retain attorneys to prosecute his claims, for which he has agreed to pay a reasonable attorneys' fee. In this regard, he is entitled to recover his reasonable attorneys' fees and expenses incurred and to be incurred in this action for the full prosecution of this claim through trial and appeal, if any, that are reasonable and necessary for him to obtain the relief he seeks. Accordingly, Plaintiff further seeks recovery of his reasonable attorneys' fees incurred and to be incurred in the prosecution of this action pursuant to pursuant to Section 38.001, *et. seq.* of the Texas Civil Practice and Remedies Code,  Ch. 541 and 542 of the Texas Insurance Code, Section 17.49 *et seq.* of the Business and Commerce Code, and any all other applicable Texas law.

## General Claims

19

74.     All notices required to be given have been given, and all conditions precedent have been satisfied.

75.     Plaintiff requests prejudgment interest at the maximum rate permitted by law, including that permitted pursuant to Tex. Ins. Code §542.060 and §1103.104(c), or the maximum rate permitted in equity.

**Demand for Jury Trial**

76.     Plaintiff demands a jury trial.

**Prayer**

For these reasons, Plaintiff requests NW Mutual be cited to appear, and on final trial, Plaintiff obtain a judgment against NW Mutual in an amount in excess of the minimum jurisdictional limits of this Court, Plaintiff be awarded judgment against NW Mutual for the above described damages in the full amounts allowed by law, together with statutory interest, reasonable attorneys' fees incurred herein, pre-judgment and post-judgment interest at the maximum rate allowed by law, costs of court, and all such other and further relief, both at law and in equity, to which Plaintiff may be justly entitled.

Respectfully submitted,


By: _____ /s/ Amar Raval _____
        Amar Raval, TBA #24046682
        Berg Plummer Johnson & Raval LLP
        3700 Buffalo Speedway, Suite 1150
        Houston, Texas 77098
        (713) 526-0200
        (832) 615-2665 (Fax)
        araval@bergplummer.com

        ATTORNEYS FOR PLAINTIFF

20